**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DATA LOGGER SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N20C-10-121 EMD |
| | ) | |
| DIGI SMARTSENSE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Submitted: June 28, 2024
Decided: September 18, 2024

*Upon Defendant's Motion for Remittitur or, in the Alternative, a New Trial*
***GRANTED***

*Upon Plaintiff's Motion For Attorney's Fees, Cost, and Judgment*
***DENIED***

Krista M. Reale, Esquire, Margolis Edelstein, Wilmington, Delaware, Herbert W. Mondros, Esquire, Rigrodsky Law, P.A. Wilmington, Delaware. Glenn Ricketti, Margolis Edelstein, Philadelphia, Pennsylvania. *Attorneys for Plaintiff Data Logger Solutions, LLC.*

David J. Soldo, Esquire, K. Tyler O'Connell, Esquire, Barnaby Grzaslewicz, Esquire, Samuel E. Bashman, Esquire, Morris James LLP, Wilmington, Delaware, Eric C. Liebeler, Esquire, Kevin Kitchen, Esquire, Stinson LLP, Minneapolis, Minnesota. *Attorneys for Defendant Digi SmartSense, LLC.*

**DAVIS, J.**

## I.      INTRODUCTION

Plaintiff, Data Logger Solutions, LLC ("DLS") filed this breach of contract, quasi-contract, and torts action on October 13, 2020, alleging that Defendants, Digi SmartSense, LLC and Digi International, Inc. breached an agreement by refusing to pay DLS commissions owed under an agreement (the "Reseller Agreement").[1]  On November 30, 2020, Digi SmartSense,

---

[1] *See* Complaint, D.I. 1.

LLC ("Digi") and Digi International, Inc. filed their answer and a counterclaim alleging one count of breach of contract.[2]

On January 3, 2023, DLS filed its Amended Complaint, with the following seven counts: (i) breach of contract, (ii) breach of implied covenant of good faith and fair dealing, (iii) tortious interference of a contract, (iv) fraud, (v) promissory estoppel, (vi) punitive damages, and (vii) declaratory relief.[3] After one motion to dismiss hearing[4] and two hearings on cross-motions for summary judgment, the Court dismissed Digi International as a party, and only DLS's Count I—breach of contract—survived the motions.

On March 22, 2024, after a five-day jury trial, DLS prevailed in the remaining breach of contract claim against Digi.[5] The jury found the following: (i) the term "Qualified Lead" ("QL") in the Reseller Agreement means a company with an individual associated with it; (ii) Digi breached the Reseller Agreement; (iii) Digi owes DLS $1,632,062 in past commissions; and (iv) Digi owes DLS $10,000,000 in future commissions.[6]

On April 8, 2024, Digi submitted its Brief in Support of its Motion for Remittitur or, in the Alternative, a New Trial ("Digi Motion").[7] On April 22, 2024, DLS filed its Brief in Opposition of Defendant's Motion for Remittitur or, in the Alternative, a New Trial ("DLS Opposition").[8] Also, on April 8, 2024, DLS submitted its Opening Brief in Support of Plaintiff's Post-Trial Motion for Attorney's Fees, Costs, and Interest ("DLS Motion").[9] On April 22, 2024,

---

[2] Answer of Digi SmartSense, LLC and Digi International Inc. and Counterclaim of Digi SmartSense, LLC, D.I. 5.
[3] D.I. 154.
[4] D.I. 196.
[5] D.I. 353.
[6] D.I. 352.
[7] Digi SmartSense, LLC's Brief in Support of Its Motion for Remittitur, or in the Alternative, a New Trial (hereinafter "Digi Motion") D.I. 362.
[8] Plaintiff's Brief in Opposition of Defendant's Motion for Remittitur, or in the Alternative, a New Trial (hereinafter "DLS Opp.") D.I. 367.
[9] Opening Brief in Support of Plaintiff's Post-Trial Motion for Attorney's Fees, Costs, and Interest (hereinafter "DLS Motion") D.I. 361.

Digi filed its Answering Brief in Opposition to Plaintiff's Motion for Attorney's Fees, Costs and Interest ("Digi Opposition").[10]  The Court held a hearing on June 28, 2024.  At the end of the hearing, the Court took the motions under advisement.

For the reasons that follow, the Court **GRANTS** Digi's Motion and **DENIES** DLS's Motion.

## II.    TRIAL EVIDENCE[11]

On September 1, 2014, DLS and Temperature@lert ("TempAlert") entered into the Reseller Agreement.  The Reseller Agreement obligated DLS, as the Reseller, to provide lead generation and strategic sales services to TempAlert, and TempAlert in return, to pay DLS a commission on all sales revenue generated from the QLs DLS provided.

In 2015, DLS referred John Davidson, a Walmart employee, to TempAlert, and soon after, Walmart and TempAlert entered into an agreement for temperature monitoring goods and related subscription services.  Then, in October 2017, Digi, a publicly owned corporation, acquired TempAlert; and with the acquisition, Digi inherited all of TempAlert's contractual obligations.

On March 8, 2019, Digi sent DLS a letter, terminating the Reseller Agreement effective April 8, 2019, pursuant to the Reseller Agreement paragraph 4.  In December 2019, Digi sent DLS an email, proposing a commission payment of $110,969.64 to constitute a "full and final payment of any amounts due under the Reseller Agreement and acknowledgment of the termination of the agreement and the satisfaction of all obligations and liabilities on behalf of

---

[10] Digi SmartSense LLC's Answering Brief in Opposition to Plaintiff's Motion for Attorney's Fees, Costs and Interest (hereinafter "Digi Opp") D.I. 368.
[11] The evidence is viewed in the light most favorable to the non-moving party.

both parties." The parties disagreed on the amount of the final payment and this litigation ensued.

During discovery, DLS learned Digi and Walmart entered into a Master Service Agreement ("MSA") on September 21, 2020, that would possibly govern all business between Digi and Walmart. Pursuant to the Reseller Agreement, DLS believes Walmart (the company) is DLS's QL. As such, DLS sought past and future commission on all revenue Digi receives from Walmart, including the transactions listed in the MSA. Digi argued that DLS interprets the Reseller Agreement incorrectly, and DLS was only entitled commissions from the 2015 Walmart transaction that included DLS's QL (an individual), Mr. Davidson.

The Court held the term QL is ambiguous. The Court determined that a jury would need to make a factual determination on the definition of QL. At trial, the jury needed to determine the following questions: (i) if QL is an individual or a company with an individual associated with it; (ii) if Digi breached the Reseller Agreement; (iii) whether DLS was owed past and future commission; and if so, (iv) the amount of damages.[12]

At trial, Gary Barach—DLS's expert— testified to amount of past and future commission owed to DLS.[13] Mr. Barach testified that Digi owes DLS $1,632,062 in past commissions[14] and $3,359,592 in future commissions.[15] Per Mr. Barach's trial testimony and expert report, DLS was owed a total of, at most, $4,991,564.[16] Gary Durham—Digi's expert— testified that DLS would be entitled to only $448,262.[17] Mr. Durham also gave an expert opinion on Mr. Barach's expert report. Mr. Durham opined that Mr. Barach's discount rate was too low and the number

---

[12] D.I. 352.
[13] *See* Digi Motion, Ex. A. Trial Transcript March 20, 2024 (hereinafter, "March 20 Tr.").
[14] *Id.* at 110:3-17.
[15] *Id.*
[16] *Id.*
[17] Digi Motion, Ex. C. Trial Transcript March 21, 2024 (hereinafter "March 21 Tr."), at 13:5-10.

of Walmart centers Mr. Barach included in his report was inaccurate.[18] Mr. Barach and Mr. Durham testified that their opinions in the case are based on a reasonable degree of economic probability.[19] No other expert testimony was offered on damages or otherwise.

Three Digi employees testified live as lay witnesses. Rebecca Brickell—Director of Sales Operations for Digi— testified regarding the transactions that are included in the MSA and current sales negotiations between Digi and Walmart.[20] Josh Griggs—Sales Director for Retail Pharmacy for Digi— testified that Walmart needs "significantly less space and less sensors to monitor" and the estimated revenue will be much less than what Mr. Barach calculated in his expert report.[21] Ryan Olstad—Financial Planning and Analysis Manager for Digi— provided testimony on the types of revenue Digi receives from the services it provides to Walmart, and Digi's forecast for future revenue from Walmart.[22] Again, Ms. Brickell, Mr. Griggs, and Mr. Olstad testified as lay witnesses and did not provide any testimony on future damages with reasonable certainty.

During closing arguments, DLS's counsel repeatedly told the jury that Digi "intentionally" breached the Reseller Agreement, Digi lied to DLS, and said Digi employees "are bad people doing bad things."[23] DLS's counsel improperly advised the jury on future damages, stating:

> I want to talk a little bit about the damages and the expansion of the possible business. The experts are limited to testify to what's probable. And you heard Mr. Barach say, I've got to limit my projections to 10 years because based upon the economic probability or certainty, I'm not going to take this relationship about 15, 20, 30 years. He can't do that as an expert. But you can look at what possible

---

[18] *Id.* at 13:14-14:10.
[19] March 20 Tr. at 86:22-87:4; March 21 Tr., at 11:5-8.
[20] *See* March 20 Tr. at 18:18 at 35:9.
[21] *Id.* at 141:19-149:19.
[22] *Id.* at 151:18-162:13.
[23] *See* March 21 Tr. at 180:1-226:23.

evidence there was for possible expansions and the relationship between Digi and Walmart.[24]

So Mr. Barach is stuck on ten years because he has to protect it within economic probability. But as a juror, when you start talking about damages, you can look into what room for expansion there may be when you want to award how much future damages Scott and Vikki are entitled to.[25]

Once DLS's counsel completed his closing argument, and before Digi's counsel began his closing, the Court reminded the jury that it does not need to find that the breach was intentional.[26]

On March 22, 2024, the jury was sent to deliberate. During deliberations, the jury sent the Court the questions: "are fees and interest included in the monetary numbers provided for both past and future commissions as well as legal fees?[27] In response, the Court stated:

I don't know that I can specifically answer. I've instructed you as to damages and you've heard the evidence as to damages and that is what you are to consider in arriving at your verdict. Okay? I know that isn't specific, but that's what it is. We've instructed you as to damages. You heard evidence as to damages and that's what you're to consider in making your determination. All right? You can go back.[28]

With that guidance, the jury continued to deliberate and returned with the following verdict: (i) QL is a company with an individual associated with it; (ii) Digi breached the Reseller Agreement; (iii) Digi owes DLS $1,632,062 in past commissions for sales prior to January 1, 2024; and (iv) Digi owes DLS $10,000,000 in commissions for future sales beginning January 1, 2024.[29]

---

[24] *Id.* at 218:2-13.
[25] *Id.* at 219:13-20.
[26] *See Id.* at 230:15-231:4.
[27] March 22 Tr. at 25:13-17.
[28] *Id.* at 28:4-12.
[29] *Id.* at 30:22-32:1.

### III.    CONTENTIONS

#### A.  MOTION FOR REMITTITUR

Digi argues the jury verdict violates Delaware law because the verdict "is based on alleged future damages that are speculative rather than reasonably certain and responsibly estimated, and it lacks any supporting expert testimony."[30]  Digi contends that Mr. Barach testified that "he had 'evidential support' for future damages of $3,359,592" so anything beyond that amount is speculative.[31]  Digi further argues that "remittitur is not enough and a new trial should be ordered on both liability and damages."[32]  In support, Digi emphasizes that DLS's "closing argument was well past both the evidence and the law.  It was an explicit plea to return a verdict on the basis of passion or prejudice."[33]

In opposition, DLS asserts that the jury verdict should not be disturbed because Digi "cannot point to any jury issues" and the "verdict was based on the evidence presented at trial."[34]  DLS believes the lay testimony "established that the relationship between [Digi] and Walmart would last beyond the ten years projected by Mr. Barach."[35]  DLS also argues that DLS's counsel did not make improper statements during closing arguments, and even if counsel did, Digi did not object, therefore the new trial argument is deemed waived.[36]

#### B.  MOTION FOR ATTORNEY'S FEES

DLS requests the Court: (i) "find the breach was intentional and in bad faith, designed to drag out this litigation, and delay payment of even the sums [Digi] admits it owes DLS; and (ii)

---

[30] Digi Motion at 1.
[31] *Id*. at 6.
[32] *Id*. at 19.
[33] *Id*. at 17.
[34] DLS Opp. at 15-16.
[35] *Id*. at 20.
[36] *Id*. at 26.

order [Digi] to pay DLS all of the costs and fees it incurred, and continues to incur."[37] DLS is moving for: (i) $4,452,824.80 in attorney's fees; (ii) $404,462.14 in out-of-pocket costs; and (iii) $507,890 in prejudgment interest.[38] A total of $5,365,176.94 in addition to the jury verdict.

In support, DLS claims that there was an "efficient breach" from Digi because Digi delayed paying DLS.[39] DLS also argues that Digi engaged in bad faith litigation because:

> The inequality in bargaining power could not be more glaring – [Digi] can easily afford to spend three and a half years and more than four million dollars litigating and then rush to post a $13 million bond. Not DLS. But for the contingency fee agreement between DLS and its counsel, SmartSense's scheme would have prevailed.[40]

DLS contends that the Paragraph 5 of the Reseller Agreement (the "Provision") allows fee shifting.[41] The Provision states:

> [Digi] agrees to indemnify, defend and hold harmless [DLS] and each of its officers, directors, employees, [DLS], sub-contractors, strategic partners, members and controlling persons (each of the foregoing, including the reseller, an "indemnified person") to the fullest extent permitted by law and against any and all losses, claims, damages, expenses (including reasonable fees and disbursements of counsel) as incurred against all claims, losses, liabilities, damages, costs, actions, proceedings or investigations, or threats thereof (all of the foregoing being referred to as "Liabilities"), based upon, relating to or arising out of the rendering of Services hereunder or any Indemnified Person's role therein, provided, however, that [SmartSense] shall not be liable under this paragraph to the extent it is determined that such Liabilities resulted from the gross negligence or willful conduct by any Indemnified Person or [DLS].[42]

In opposition, Digi argues that this case is an action at law and the bad faith exception does not apply.[43] And even if it did apply, DLS failed to meet its burden to show bad faith.[44] Digi contends that DLS's "argument as to efficient breach is irrelevant" because DLS cites no

---

[37] DLS Motion at 26.
[38] *Id.* at 2.
[39] *Id.*
[40] *Id.* at 28.
[41] *Id.* at 32.
[42] *See* D.I. 154, Ex. 1.
[43] Digi Opp at 4.
[44] *Id.* at 5.

Delaware case law to support its position.[45]  Digi also contends that the Provision is an indemnity provision and "does not expressly authorize fees in connection with claims between the parties."[46]

## IV.    LEGAL STANDARD

### A. CIVIL RULE 59 STANDARD

Under Superior Court Civil Rule 59, the court may grant a new trial "on all or part of the issues in an action in which there has been a trial for any of the reasons for which new trials have heretofore been granted in the Superior Court."[47]  In the alternative to a new trial, remittitur gives the plaintiff the option to agree to a reduced verdict that is fixed and approved by the court.[48]

In Delaware, a jury verdict is given enormous deference.[49]  "A verdict will not be disturbed as excessive unless it is so clear as to indicate that it was the result of passion, prejudice, partiality, or corruption; or that it was manifestly the result of disregard of the evidence or applicable rules of law."[50]  As such, a verdict will not be set aside simply because it is excessive in the mind of the Court, but only where, under the attendant facts, a grossly excessive verdict is clearly manifest.[51] The Court may set aside a verdict if the verdict "is so grossly excessive as to shock the Court's conscience and sense of justice; and unless the injustice of allowing the verdict to stand is clear."[52]

---

[45] *Id.* at 11.
[46] *Id.* at 12.
[47] *See Linn v. United Plant Guard Workers of Am., Loc. 114,* 383 U.S. 53, 86 (1966) (stating "If the amount of damages awarded is excessive, it is the duty of the trial judge to require a remittitur or a new trial.").
[48] *Burns v. Delaware Coca-Cola Bottling Co.*, 224 A.2d 255 (Del. Super. Ct. 1966). "If a court determines that the amount of the award is inconsistent with the evidence in a case, it must offer a new trial as a[ ] [conditional] alternative to a reduction in the award in order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial." *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376 (3d Cir. 2016) (internal quotation marks omitted).
[49] *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997); *see also Burns,* 224 A.2d at 258 (stating, "In short, interference with the verdict of a jury is a serious matter and should be recognized as such.").
[50] *Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973).
[51] *Id.* (stating that when there is a reasonable difference of opinion in the matter, the court will yield to the jury's verdict).
[52] *Id.*

9

## B. CIVIL PROCEDURE RULE 54(D) STANDARD

Delaware Rule of Civil Procedure 54(d) provides that "Except when express provision therefor is made either in a statute or in these Rules or in the Rules of the Supreme Court, costs shall be allowed as of course to the prevailing party. . . ."

Generally, Delaware follows the "American Rule," whereby each party is expected to pay its own attorneys' fees and expenses, regardless of the outcome.[53]  However, "Delaware courts have the power to shift attorneys' fees where a losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[54]  Bad faith may exist  where "parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims[,] ... mis[led] the court, alter[ed] testimony, or chang[ed] position on an issue."[55]

"But in an action at law, absent a statutory or contractual provision, a court may not ordinarily order the payment of attorneys' fees as costs to be paid by the losing party."[56]  When none of the exceptions are applicable, the court limits its inquiry to applicability of a fee statute and contract.[57]

---

[53] *See generally Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[54] *Dover Hist. Soc., Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1093 (Del. 2006).

[55] *Id*. (internal citations omitted).

[56] *Id*. at 1090.

[57] *Slawik v. State*, 480 A.2d 636, 639 (Del. 1984). 10 *Del. C*. § 5101 provides:

> In a court of law, whether of original jurisdiction or of error, upon a voluntary or involuntary discontinuance or dismissal of the action, there shall be judgment for costs for the defendant. Generally a party for whom final judgment in any civil action, or on a writ of error upon a judgment is given in such action, shall recover, against the adverse party, costs of suit, to be awarded by the court.

## V.    DISCUSSION

### A. MOTION FOR REMITTITUR

In a breach of contract action, "the damages are strictly limited by principles of law."[58] Damages must be proved with reasonable certainty.[59] When evaluating damages, less certainty is required so long as the injured party proves there would have been some profits from the contract.[60] "No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative."[61]

Delaware Rule of Evidence 701 limits lay witness testimony to opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge. . . ." Lay experts cannot provide testimony on future damages with reasonable certainty.[62] Delaware law requires that economic and financial damages require expert testimony.[63]

DLS, in its opposition, contends "[t]here was substantial evidence for the jury to find that the relationship between [Digi] and Walmart would continue beyond the ten years projected" by Mr. Barach.[64] To support its position, DLS offers opinions of lay witnesses—witnesses that cannot and did not offer an opinion on future damages—to show there is potential of Digi's and Walmart's relationship lasting well beyond ten-years.[65] During closing arguments, DLS's

---

[58] *Chrysler Corp. v. Quimby*, 144 A.2d 123, *adhered to on reh'g*, 144 A.2d 885 (Del. 1958).
[59] *Id.*
[60] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015), *as corrected* (Dec. 28, 2015).
[61] *Siga Techs., Inc. v. PharmAthene, Inc.,* 67 A.3d 330 (Del. 2013).
[62] *See PJ King Enterprises, LLC v. Ruello*, 2008 WL 4120040, at *2. (Del. Super. Ct. July 1, 2008) (holding "that lay witness testimony may not address diminution in value or economic or financial loss. This testimony requires special skill or knowledge that is not appropriate for the lay witness.").
[63] *Id.*; *See also Empire Financial Services, Inc. v. Bank of New York (Delaware),* 2007 WL 1991179, *4 (Del.Super.Ct. June 19, 2007).
[64] DLS Opp. at 3.
[65] *See Id.*

counsel also misstated the correct legal standard on future damages to the jury. Although future damages are based on reasonable certainty, DLS's counsel asked the jury to essentially award whatever they find appropriate.

This civil action is a breach of contract action, and damages must be proven with reasonable certainty. Digi's employees, lay witnesses, testified to help the jury understand where Digi's and Walmart's relationship currently stands. The lay witnesses did not and could not testify on future damages with reasonably certainty. As such, the lay witnesses' testimony cannot support a $10,000,000 verdict.

The expert testimony, although offered with reasonable certainty, also cannot support a $10,000,000 verdict in future damages. Mr. Barach testified—with reasonable certainty— that DLS is owed $3,359,592 in future commissions. Mr. Barach based his future damages on a ten-year projection; anything beyond that is speculative. There is no room for speculation here.

DLS met its burden of establishing Digi breached the Reseller Agreement, so "less certainty" is required to prove damages.[66] However, the standard does not allow recovery for uncertain damages. Nothing in the record supports a finding that $10,000,000 in future damages is reasonably certain. As such, the verdict of $10,000,000 in future damages shocks the conscience of the Court. Therefore, Digi is entitled to remittitur of future damages.[67]

### B. MOTION FOR ATTORNEY'S FEES

Here, DLS is not entitled to attorney's fees under the bad faith exception nor is DLS entitled to attorney's fees by statute or contract. The Provision is not ambiguous; it states, in relevant part:

---

[66] Digi essentially conceded that there was a breach of contract and told the jury that DLS is potentially owed $450,000 under the Agreement. *See* March 21 Tr. at 268:22-269:9.

[67] "To permit such verdicts to stand can only corrupt a legal process which must always have justice as its standard and which must never become a mere game of chance." *Burns,* 224 A.2d at 258.

[Digi] agrees to indemnify, defend and hold harmless [DLS] and each of its officers, directors, employees, [DLS], sub-contractors, strategic partners, members and controlling persons (each of the foregoing, including the reseller, an "indemnified person") to the fullest extent permitted by law and against any and all losses, claims, damages, expenses (including reasonable fees and disbursements of counsel) as incurred against all claims, losses, liabilities, damages, costs, actions, proceedings or investigations, or threats thereof (all of the foregoing being referred to as "Liabilities"), based upon, relating to or arising out of the rendering of Services.

The Provision does not expressly indicate that either party will absorb the cost of litigation when the claims are between the contracting parties. A fair reading of the Provision would indicate that Digi would indemnify DLS if DLS incurs any cost of litigation while DLS renders its contractual services to a third-party.

The bad faith exception does not apply here. On numerous occasions the Court ruled this case does not rise to level of a tort.[68] However, DLS continues to make the same unavailing "bad faith" and "intentional breach" arguments. There is nothing in to record to support a finding of bad faith.

The Court noted that this is an economic breach of contract case; there is no tort action. The parties disagreed on the definition of Qualified Lead or QL and on the amount of commissions Digi owed to DLS. Both parties offered reasonable definitions and the case went to

---

[68] "A legitimate dispute as to the interpretation of the Reseller Agreement does not rise to the level necessary for the application of punitive damages." *See* Order Denying Motion for Reargument of the Court's January 25, 2024, and February 2, 2024, Orders Granting Defendants' Motion for Summary Judgment as to Count III of the Amended Complaint Alleging Tortious Interference Against Defendant Digi International, Inc. and Dismissing Plaintiff's Claim for Punitive Damages. D.I. 324. Then again, during the prayer conference, the Court stated:

There may have been an economic breach, which is an intentional breach. But that's not what the punitive -- the punitive damages is there's a breach that the conduct is such that it rises to the level of the tort. *And I can tell you right now, this does not rise to the level of a tort. This is all about economic breaches.* Whether they might move or not, I don't know. But they weren't doing it because they hated Data Loggers. It's just not supported.

So I feel very comfortable in my rulings. I feel very comfortable that there are two reasonably susceptible means that this should be given to a jury.

*See* March 21 Tr. at 170:8-171:2; 173:5-8 (emphasis added).

the jury. DLS maintains there was "inequality in bargaining power" which demonstrates that Digi acted in bad faith. DLS also argues that because Digi can afford legal fees, Digi prolonged litigation. The evidence supports no such position. Digi believed its definition of Qualified Lead was correct and litigated its position in good faith. The American Rule applies, therefore, DLS's Motion is **DENIED**.

## VI. CONCLUSION

For the reason stated, Digi's Motion is **GRANTED,** and the future damages are remitted to $3,359,592. Digi only disputes the verdict on future damages, therefore the past commissions verdict of $1,632,062 remains, and the total award to DLS is remitted to $4,991,654. DLS's Motion is **DENIED**.

In ordering remittitur of a jury's award of damages, the Court is required to allow the plaintiff the option to either remit the stated portion of the damage judgment or submit to a new trial.[69] As such, DLS has the option of accepting the remittitur or ask for a new trial. DLS has thirty (30) days from the date of this decision to notify the Court whether it wants a new trial.

**IT IS SO ORDERED.**

September 18, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeXpress

---

[69] *Riegel v. Asstad*, 272 A.2d 715, 718 (Del. 1970); *see also Moffitt v. Carroll*, 640 A.2d 169, 176 n. 3. (Del. 1994).

14